# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| PACE INDUSTRY UNION-MANAGEMENT PENSION FUND and BOARD OF TRUSTEES OF THE PACE INDUSTRY UNION-MANAGEMENT PENSION FUND, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 3:15 C 01032 |
| v. | ) | Hon. Marvin E. Aspen |
| | ) | |
| ROBERT WOOD JOHNSON UNIVERSITY HOSPITAL, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

The plaintiff pension fund, Pace Industry Union-Management Pension Fund and the Board of Trustees of the Pace Industry Union-Management Pension Fund (collectively "Plaintiff") alleges Defendant Robert Wood Johnson University Hospital ("RWJUH" or "Defendant") has failed to meet its contractual and statutory obligations under Section 515 of the Employee Retirement Income Security Act ("ERISA") to make pension contributions to the Pace Industry Union-Management Pension Fund ("PIUMPF" or "the Fund"), a multiemployer pension plan that provides retirement benefits. Currently pending are the parties' cross motions for summary judgment. (Dkt. Nos. 40, 41.) Also pending is a joint motion to modify the scheduling order to extend the trial date and pretrial deadlines. (Dkt. No. 67.) Plaintiff's partial motion for summary judgment seeks judgment as a matter of law as to its claim for delinquent contributions involving several classes of nurses. Defendant's motion argues Plaintiff's one-count complaint should be dismissed in its entirety because Plaintiff has failed to put forth sufficient evidence to

prove that RWJUH failed to make pension contributions on behalf of any nurses in violation of ERISA. For the reasons that follow, both summary judgment motions are granted in part and denied in part. The motion to modify is denied as moot.

## BACKGROUND

Unless otherwise stated, the facts described herein are undisputed and culled from the parties' Local Rule 56.01 submissions. (*See* Pl.'s SOF (Dkt. No. 51); Def.'s SOF (Dkt. No. 44).) The Fund is a jointly trusteed multi-employer pension fund created and overseen by union-appointed and employer-appointed trustees. (Pl.'s SOF ¶ 1.) The Fund is governed by the Plan Document (which details its responsibility to pay pension benefits) and the Declaration of Trust (to which each participating employer is a party and which outlines the powers and duties of the trustees and the obligations of the participating employers). (*Id.* ¶¶ 6–7, 9.) Participating employers' contributions to PIUMPF are pooled in a general fund available to pay any benefit obligation of the plan. (*Id.* ¶¶ 1–2.) The purpose of the Fund is to provide pension and other benefits to employees in covered employment. (*Id.* ¶ 7.) The Fund is solely responsible for payment of pension benefits to participants, regardless of whether it receives required contributions from employers for those participants. (*Id.* ¶¶ 2, 8.)

RWJUH is an acute care facility in New Brunswick, New Jersey that at all times relevant was part of the Robert Wood Johnson Health System. (Def.'s SOF ¶¶ 4–5.) From 2003 to 2012, RWJUH was party to a series of collective bargaining agreements ("CBAs") with the local union representing its registered nurses. (Pl.'s SOF ¶¶ 17–19.) It began contributing to PIUMPF in October 2003 after RWJUH and the union entered into a CBA effective June 29, 2003 to June 30, 2006 ("2003–2006 CBA"). (Def.'s SOF ¶ 6.) The 2003–2006 CBA provided that RWJUH "agrees to contribute $1.00 per hour per employee to PACE Pension 'Plan A' for the

life of the Agreement consistent with the terms of the Standard Form of Agreement of the PACE Industry Union-Management Pension Fund." (Pl.'s SOF ¶¶ 27–28; Def.'s SOF ¶ 7; *see also* 2003–2006 CBA (Dkt. No. 48–5) at Art. 16.) RWJUH and the union executed a successor agreement effective September 2006 to June 30, 2009 ("2006–2009 CBA"), and thereafter executed another CBA effective July 1, 2009 to June 30, 2012 ("2009–2012 CBA"). (Def.'s SOF ¶¶ 13, 19.) RWJUH's contribution obligation remained the same in each subsequent CBA, except the negotiated contribution rate increased under each successive CBA. (Pl.'s SOF ¶¶ 28–30.)

Each CBA provided that RWJUH agreed to abide by the terms of a Standard Form of Agreement ("SFA") between RWJUH and the Fund. (*Id.*) The SFAs provide that the employer agrees to become a party to the Fund and the Trust Agreement and detail the employers' contribution obligations. (*Id.* ¶¶ 35, 41–44.) All contributing employers are subject to the same SFA terms, except for the applicable dates and contribution rates, which vary depending on the employer's pension program and benefit levels offered. (*Id.* ¶ 10.) Section I of the SFAs in effect from 2003–2006 and from 2006–2009 provides:

> Commencing with the day stated below the undersigned Employer: 1) if subject to a collective bargaining agreement with the undersigned Union ("collective bargaining agreement") agrees to pay the PACE INDUSTRY UNION-MANAGEMENT PENSION FUND (hereinafter called the Fund) the amount stated below for each compensable hour, outlined below, for employees subject to the collective bargaining agreement.

(Def.'s SOF ¶¶ 8, 15; 2003–2006 SFA (Dkt. No. 48–6) at Section I; 2006–2009 SFA (Dkt. No. 48–9) (same).) The "compensable hours that payment to the Fund shall be based" upon include, among other things, "[a]ll hours worked, including overtime," and "[a]ll hours called for under the collective bargaining agreement, but no less than eight (8) hours per day for each holiday not worked." (*Id.*) Section I further states:

Language in the collective bargaining agreement to the contrary notwithstanding, the Employer shall contribute on all individuals performing work covered by the collective bargaining agreement, including probationary, temporary, and part-time employees, except for those newly hired individuals in the employ of the Employer for a period of less than sixty (60) calendar days, regardless of the number of days or hours actually worked by the individual during the sixty (60) day period.

(Def.'s SOF ¶¶ 9, 16; 2003–2006 SFA at 1; 2006–2009 SFA at 1.)

The 2003 and 2006 CBAs defined the "bargaining unit" as:

all full-time and regular part-time registered nurses and graduate nurses employed by Robert Wood Johnson Hospital at its New Brunswick location, including those registered nurses and graduate nurses employed as registered nurse first assistants, staff nurses, in-service education instructors, infection control nurses, utilization review nurses, community health nurses, urology clinical coordinator, home trainer coordinators (dialysis), home trainers renal dialysis, field service worker/discharge planning nurses, Sr. discharge planners, discharge planning nurses, assistant head nurses-operating room, scoliosis program coordinators, program coordinators, Pediatric Chronic Disease Program, Cardiac Catherization nurses, cardiac rehabilitative nurses, specials procedures nurses, vascular laboratory nurses, lithotripter nurse, oncology nurses and directors, directors of home care, administrative supervisors, head nurses, assistant head nurses (except operating room), all other professional employees other than registered nurses, technical employees, guards and supervisors within the meaning of the Act and all other employees.

(2003–2006 CBA at Art. 1.1; 2006–2009 CBA (Dkt. No. 48–8) (same).) The 2009–2012 CBA differed slightly in that it added "and all positions considered bargaining unit [sic] as of July 1, 2009" before the list of exclusions. (2009–2012 CBA (Dkt. No. 48–10) at Art. 1.1.) Each CBA stated "[w]henever the terms 'employee' or employees' are used hereinafter in this Agreement, they shall be deemed to apply only to employees of the Hospital who are included within the bargaining unit above described." (2003–2006 CBA at Art. 1.2; 2006–2009 CBA (same); 2009–2012 CBA (same).)

In 2007, RWJUH's payroll for October 2003 to December 2005 was audited (the "First Audit") to "determine the accuracy of the hours reported on the remittance reports and contributions paid by the Employer." (Def.'s SOF ¶ 34.) The audit also examined "whether the

Employer is in compliance with the Standard Form of Agreement between the Employer and [PIUMPF]." (*Id.* ¶ 35.) The Fund regularly engages an independent accounting firm, Bond Beebe, to audit contributing employers on a regular basis to ensure employers paid the correct amount of contributions to the fund. (Pl.'s SOF ¶¶ 11–12.) Plaintiff alleges RWJUH calculated its contributions by use of an automated process by which, for each bi-weekly pay period, it generated a "PACE Defined Benefits Report" detailing contributions by employee job code. (*Id.* ¶¶ 45–49.) Based on these records, the final First Audit Report concluded RWJUH failed to contribute on behalf of several job classifications: Clinical Nursing Specialist, Nursing Education Specialists, Clinical Educators of Operations, Diabetes Nurse Clinicians, and Community Health Nurse. (*Id.* ¶¶ 80–82.)

The auditor completed a second audit report on June 12, 2008 for the period of January 2006 to December 2007 (the "Second Audit"). (*Id.* ¶ 84.) As relevant here, the final Second Audit Report concluded RWJUH failed to contribute for "on call" hours, "weekend per diem" hours, and hours worked by "leased" nurses who were hired through staffing agencies and who are not on RWJUH's payroll. (Def.'s SOF ¶¶ 49–51.) Thereafter, a third audit report was completed on February 18, 2014 (the "Third Audit"). (Pl.'s SOF ¶ 92.) The Third Audit addressed RWJUH's records covering the period from January 2008 to December 2011, and from 2003 to 2012 for "leased" nurses. (*Id.*) The Third Audit Report alleged RWJUH owed $859,483.78 in unpaid contributions for 2003 through 2012, including $162,525.31 related to hours worked by leased nurses. (Def.'s SOF ¶ 58; Pl.'s SOF ¶¶ 93–99.)

Plaintiff filed the instant complaint on September 25, 2015,[1] alleging RWJUH failed to make pension contributions in violation of Section 515 of ERISA. Plaintiff alleges that audits of benefits reports from 2003 to 2011 revealed RWJUH failed to remit payment for contributions due and owing to the Fund totaling $859,483.78 in delinquent contributions. (Compl. ¶ 30.) Plaintiff also alleges RWJUH is liable interest on those delinquent contributions, an amount it claims totaled $824,066.06 as of June 30, 2015, as well as $103,355.45 in costs associated with the audit for the final Third Audit Report. (*Id.*) Finally, Plaintiff contends it is entitled to liquidated damages, interest, attorneys' fees, and costs. (*Id.* ¶ 31.)

## LEGAL STANDARD

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a

---

[1] Plaintiff also filed an earlier lawsuit after the Second Audit was completed, alleging RWJUH was indebted to the Fund in the amounts identified in the First and Second Audit Reports. (Pl.'s SOF ¶ 86.) The parties reached a settlement of the claims on April 2, 2013. (*Id.* ¶ 87.) They agreed to toll any statute of limitations and provided that either party could bring an action in federal court to resolve the outstanding issues. (*Id.* ¶¶ 88–91.)

genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). "Where the parties have filed cross-motions for summary judgment, we 'evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the nonmoving party.'" *Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio*, 133 F.3d 955, 958 (6th Cir. 1998) (quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)). "The judge is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (quoting *Liberty Lobby*, 477 U.S. at 249, 106 S. Ct. at 2511).

## ANALYSIS

"When collective-bargaining agreements create pension or welfare benefits plans, those plans are subject to rules established in ERISA." *M & G Polymers USA, LLC v. Tackett*, — U.S. —, 135 S. Ct. 926, 933 (2015). Under Section 515 of ERISA, employers are obligated to make contributions in accordance with an applicable collective bargaining agreement. *Brown-Graves Co. v. Cent. States, Se. and Sw. Areas Pension*, 206 F.3d 680, 683 (6th Cir. 2000). Section 515 provides,

> [e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. "Because, under [S]ection 515, multiemployer plans are entitled to rely on the literal terms of written commitments between the plan, the employer, and the union, the actual intent of and understandings between the contracting parties are immaterial." *New Bakery*, 133 F.3d at 959; *see also Operating Eng'rs Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1051 (6th Cir. 2015) ("[T]he multi-employer plans may rely on the literal terms of written agreements between the employer and the union."). Relying on the collective

bargaining agreements and plans as written "serves the purpose of enabling beneficiaries to learn

their rights and obligations at any time," and "lends certainty and predictability to employee

benefit plans." *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 561 (6th Cir. 2015) (internal

quotations omitted); *see also New Bakery*, 133 F.3d at 959 (observing "Congress enacted

Section 515 in order to permit "trustees of plans to recover delinquent contributions

efficaciously, and without regard to issues which might arise under labor-management relations

law" (internal quotations omitted)). "The fund thus stands much like a holder in due course in

commercial law who is entitled to enforce the writing without regard to understandings or

defenses applicable to the original parties." *New Bakery*, 133 F.3d at 959 (further explaining that

by "allowing multiemployer funds to enforce the literal terms of an employer's commitment,

[S]ection 515 increases the reliability of their income streams, reduces the cost and delay

associated with collection actions, and reduces or eliminates the cost of monitoring the formation

of collective bargaining agreements" (internal quotations omitted)); *accord. Nw. Ohio Adm'rs,

Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1025 (6th Cir. 2001) (applying "the well-established

precedent that ERISA funds are accorded a special status and are entitled to enforce the

writing").

Accordingly, we must "examine the plan documents and the collective bargaining

agreement to determine the scope of [the employer's] obligation to contribute to the Pension

Fund." *New Bakery*, 133 F.3d at 959. Collective-bargaining agreements are interpreted

according to ordinary principles of contract law, at least when those principles are not

inconsistent with federal labor policy. *Tackett*, 135 S. Ct. at 933; *Orrand*, 794 F.3d at 561.

"Where a contract is in writing and its terms are clear and unambiguous, we ascertain the

contract's meaning in accordance with the contract's plainly expressed intent."

*Orrand*, 794 F.3d at 562. Whether a contract term is ambiguous is a question of law for the court to determine. *Walcher & Fox*, 270 F.3d at 1025. Each provision of the CBA is interpreted "consistently with the entire document and the relative positions and purposes of the parties" in order to "give full meaning and effect to all [plan documents'] text, avoiding constructions that would render provisions illusory." *Moore v. Menasha Corp.*, 690 F.3d 444, 451 (6th Cir. 2012) (quoting *UAW v. Yard–Man, Inc.*, 716 F.2d 1476, 1480 (6th Cir. 1983)). "If, however, the plain language is susceptible to more than one interpretation, we then consider extrinsic evidence to supplement the parties' intent." *Id.* "If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of fact as to intent remains, then summary judgment is improper." *Id.* (quoting *Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008)); *accord. Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) ("The existence of an ambiguity is a matter of law; once language is held to be ambiguous, however, the interpretation of such language is a factual issue turning on the parties' intent.").

Plaintiff and RWJUH dispute whether the hospital was required to contribute to the Fund for hours worked by: (1) Case Managers; (2) per diem nurses; (3) leased nurses; (4) Nursing Education Specialists/Nursing Education Associates, Clinical Nursing Specialists, Clinical Educators of Operations, and Diabetes Nurse Clinicians; (5) Community Health Nurses; and (6) Child Life Coordinators. We address the parties' arguments with respect to each group of nurses below.

## I.    CASE MANAGERS

Plaintiff contends that RWJUH owes $42,550.75 in delinquent contributions for Case Managers (job code PP338) from October 1, 2006 to September 30, 2007. (Pl.'s SOF ¶ 104(a).) RWJUH admits that it did not contribute on behalf of Case Managers between October 1, 2006 and September 30, 2007. (Def's Resp. to Pl.'s SOF (Dkt. No. 54) ¶¶ 74–77.) However, RWJUH

9

denies that contributions were due on behalf of Case Managers, instead arguing the Fund was not entitled to contributions for Case Managers until they were expressly incorporated into the CBA for the first time on June 11, 2007. There is no dispute that contributions were not owed for Case Managers under the 2003–2006 CBA as they were not part of the bargaining unit during that period.

Case Managers were added to the 2006–2009 CBA pursuant to Appendix C, which set forth the "terms and conditions of employment for the Case Managers who are part of the larger bargaining unit of Registered Nurses." (Pl.'s SOF ¶ 23.) RWJUH argues Appendix C was not incorporated into the 2006–2009 CBA until June 11, 2007 pursuant to a Memorandum of Agreement ("MOA"). (Def.'s Resp. to Pl.'s SOF ¶¶ 75–77, 104.) RWJUH contends that the ratification date for Appendix C was not the same as the effective date for the CBA as a whole, and the MOA therefore governs the commencement of its contribution obligation. (Def.'s Resp. Br. (Dkt. No. 53) at 5.)

Article 34 of the 2006–2009 CBA provides that the "terms and conditions of employment for the Case Managers who are a part of the larger bargaining unit of Registered Nurses are set forth in the attached Appendix C." (2006–2009 CBA at Art. 34.) Appendix C likewise states that it "is intended to set forth the terms and conditions of employment for the Case Managers who are part of the larger bargaining unit of Registered Nurses" and "[u]nless otherwise indicated the provisions of the [CBA] apply to the Case Managers." (2006–2009 CBA, App'x C at 46.) In relevant part, Appendix C amended the Article 15 "Retirement Plan" provision to state "[e]ffective the first day of the next calendar quarter following ratification of this Agreement, the Hospital agrees to contribute $1.10 per hour per employee to PACE Pension 'Plan A' for the life of the Agreement consistent with the terms of the Standard Form of

Agreement of the PACE Industry Union-Management Pension Fund." (2006–2009 CBA, App'x C at Art. 15.)

The 2006–2009 CBA became effective September 18, 2006. (Pl.'s SOF ¶ 25.) Plaintiff argues that the language of Appendix C plainly provides that RWJUH was obligated to begin making contributions for hours worked by Case Managers beginning October 1, 2006, which was the start of the next calendar quarter after ratification. (Pl.'s Mem. ISO Partial Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No. 42) at 11.) However, RWJUH did not begin making contributions for Case Managers until the next calendar quarter after it claims the MOA was executed, or September 30, 2007. (Pl.'s SOF ¶¶ 54, 75–77.) Plaintiff also argues RWJUH's reliance on the MOA is misplaced because the MOA is inadmissible. (Pl.'s Reply (Dkt. No. 62) at 6–10.) Plaintiff contends RWJUH failed to produce it in discovery and only disclosed it for the first time in response to Plaintiff's summary judgment motion. (*Id.*)

We do not consider the MOA because the plain language of the CBA compels the conclusion that RWJUH was obligated to contribute on behalf of Case Managers starting October 1, 2006. The reference to "this Agreement" in Article 15 of Appendix C plainly refers not to the MOA, but to the CBA, which also references at the outset, "THIS AGREEMENT made this 18th day of September, 2006." (2006–2009 CBA at 1.) The CBA refers throughout to the terms of "this Agreement." (*See, e.g.*, *id.* at Art. 35.1 ("This Agreement shall be in effect from September 18, 2006 to June 30, 2009"); Art. 15 ("The Hospital agrees to contribute $1.10 per hour per employee to PACE Pension 'Plan A' for the life of the Agreement . . .").) The 2006–2009 CBA itself also refers internally to Appendix C. Specifically, Article 34 in the body of the 2006–2009 CBA is titled "Case Managers Registered Nurses" and provides, "[t]he terms and conditions of employment for the Case Managers who are part of the larger bargaining unit

of Registered Nurses are set forth in the attached Appendix C." (2006–2009 CBA at Art. 34.) Thus, it is contrary to the express terms of the CBA to read Appendix C as having been incorporated, executed, and effective nearly a year after the rest of the CBA.

Because the CBA terms are clear and unambiguous, we enforce its plainly expressed intent. *Orrand*, 794 F.3d at 562. The Fund is entitled to rely on the written commitments between the employer and the union as the CBA language is clear. *New Bakery*, 133 F.3d at 959. Extrinsic evidence cannot create a genuine dispute of material fact, and the fund administrators are "not required to look into potential side agreements" or "read the minds of contracting parties" where, as here, the contract language is unambiguous. *Walcher & Fox*, 270 F.3d at 1025. Moreover, the MOA cited by RWJUH differs from Appendix C to the CBA as incorporated, and a pension fund need not search "on its own or through counsel, numerous collective bargaining agreements for additional, different, or conflicting terms regarding pensions." *New Bakery*, 133 F.3d at 961; *compare* MOA (Dkt. No. 53–2) at PageID #: 1542–50, *with* 2006–2009 CBA, App'x C at 72–80).

For the foregoing reasons, we find no genuine dispute of fact as to RWJUH's obligation to contribute on behalf of Case Managers (Job Code PP338) for the period October 1, 2006 to September 30, 2007. *Walcher & Fox*, 270 F.3d at 1025. Pursuant to Article 34 of the 2006–2009 CBA, Case Managers were "part of the larger bargaining unit of Registered Nurses," as of the date of execution on September 18, 2006. (2006–2009 CBA, Art. 34; *see also* RWJUH's Resp. to Requests to Admit (Dkt. No. 45–9) ¶¶ 4–6.) Aside from disputing the meaning of the contract language, RWJUH admits that it did not begin making contributions for Case Managers until the pay period beginning September 30, 2007. (Def.'s Resp. to Pl.'s SOF ¶¶ 74–77, 104.) Because we find the CBA unambiguously obligated RWJUH to begin

contributing on behalf of Case Managers "[e]ffective the first day of the next calendar quarter following ratification of this Agreement," the Fund is entitled to recover the delinquent Case Manager contributions for the period from October 1, 2006 to September 30, 2007. Plaintiff's motion for summary judgment is therefore granted with respect to its claim for contributions owed on behalf of Case Managers.

## II.  PER DIEM NURSES

RWJUH next contends that Plaintiff cannot prevail with respect to its claim that per diem nurses were entitled to contributions. RWJUH argues it is undisputed that per diem nurses do not qualify as "employees" as that term is defined in the CBA and the Trust Agreement, and the National Labor Relations Board ("NLRB") has specifically determined per diem nurses are excluded from the bargaining unit. (Def.'s Mem. ISO Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 43) at 14.) Plaintiff does not dispute that the bargaining unit did not include per diem nurses, or that "work they performed as *properly classified* per diem nurses was not bargaining unit work." (Pl.'s Resp. Br. (Dkt. No. 55) at 23 (emphasis in original).) Rather, Plaintiff argues an issue of fact exists as to whether some per diem nurses were misclassified by RWJUH, and in fact performed bargaining unit work. (*Id.*)

In addition to full-time and regular part-time nurses on its payroll, and separate from leased nurses hired from staffing agencies, RWJUH employed per diem nurses in each year between 2004 and 2011. (Pl.'s SOAF (Dkt. No. 56) ¶ 79.) Per diem nurses' hours are not guaranteed. (*Id.* ¶ 80; Pl.'s Resp. at 23–24.) Rather, RWJUH hires per diem nurses on its payroll on an as-needed basis when shifts become available. (*Id.* ¶ 80.) Because properly per diem nurses do not work regular schedules, Plaintiff concedes they are not part of the bargaining unit. (Pl.'s Resp. at 24, n.13; *see also* 2003–2006 CBA at Art. 1.4 ("[P]art-time employees who are not regularly scheduled by the Hospital to work at least thirty-two (32) hours per bi-weekly

13

pay period . . . shall not be entitled to fringe benefits, except as otherwise provided herein.");
2006–2009 CBA at Art. 1.5 (same); 2009–2012 CBA (same).)  However, nurses may transition
from per diem to full-time or part-time employees, at which point RWJUH would provide the
nurse with a new hire date.  (*Id.* ¶ 81.)

Plaintiff offers payroll records showing that in each year from 2004 to 2011, some nurses
classified by RWJUH as per diem nurses worked enough hours to qualify as "regular part-time"
employees under the CBAs, *i.e.*, they worked in excess of 832 hours per year.
(Pl.'s SOAF ¶¶ 82–83.)  The CBA defines "regular part-time work" as at least 32 hours in a
bi-weekly pay period, which corresponds to 832 hours per year.  (*Id.* ¶ 83.)  Plaintiff argues the
"regularity of these nurses' employment raises the reasonable inference that they were
performing nursing work at RWJUH on a full-time or regular part-time basis" and therefore, an
issue of fact exists as to whether these hours should have been considered hours covered by the
CBA and subject to the contribution obligations of the SFA.  (Pl.'s Resp. at 24.)  Plaintiff also
points to the First Audit Report, which recommended that the job codes for some nurses be
changed because they were misclassified and instead working full-time or regular part-time
schedules.  (First Audit Report (Dkt. No. 48–14) at 4 ("Per-diem Nurse are [sic] not covered by
the Collective Bargaining Agreement.  However, the employer does not review the hours worked
by this classification, and some may work regular full and part-time schedules.  If the employer
by chance discovers that a Per-diem Nurse is working consistant [sic] full or part-time hours, it is
requested that the employee's status/job code is changed.  The employer has 250 to 300 per diem
nurses on it's [sic] payroll each year.").

There is no dispute that per diem nurses are excluded from the bargaining unit, and
RWJUH had no obligation to contribute for the hours worked by properly-classified per diem

nurses.  However, Plaintiff has raised sufficient evidence to show that some per diem nurses may have been improperly classified by RWJUH.  Accordingly, there is a genuine dispute of material fact, and summary judgment cannot be granted.  Trial is necessary to determine whether RWJUH misclassified any per diem nurses who were in fact "full-time or regular part-time" employees included in the collective bargaining unit.

## III.     LEASED NURSES

The parties also dispute whether RWJUH owes contributions for "leased" nurses (also referred to as "contract" or "traveler" nurses), and they have each moved for summary judgment based on their interpretation of the relevant agreements.  Leased nurses are not on RWJUH's payroll, but are hired and paid through employment agencies to provide nursing services.  (Pl.'s SOF ¶¶ 96–98.)  Plaintiff contends RWJUH owes $162,525.31 in delinquent contributions for leased nurses from October 2003 to December 2012, a period during which RWJUH continued to engage such workers.  (Pl.'s SOF ¶¶ 93, 97, 99, 104(f); Pl.'s SOAF ¶ 73.)  RWJUH admits it did not make contributions on behalf of any hours worked by leased nurses, instead arguing it was not required to do so pursuant to the language in the governing CBAs, SFAs, and Trust Agreement.  (*See* Def's Resp. to Pl.'s SOF ¶ 93.)

### A.   SFA Section I

The parties' disagreement largely centers on their respective interpretations of Section I of the SFAs.  (2003–2006 SFA at Section I; 2006–2009 SFA (same).)  Pursuant to Section I, RWJUH agreed to pay the Fund "for each compensable hour, outlined below, for employees subject to the collective bargaining agreement." (*Id.*)  The "compensable hours that payment to the Fund shall be based" include, among other things, "[a]ll hours worked, including overtime," and "[a]ll hours called for under the collective bargaining agreement, but no less than eight (8) hours per day for each holiday not worked." (*Id.*)  In addition, Section I provides that,

"[l]anguage in the collective bargaining agreement to the contrary notwithstanding, the Employer shall contribute on all individuals performing work covered by the collective bargaining agreement, including probationary, temporary and part-time employees." (*Id.*)

Emphasizing the "*employees* subject to the collective bargaining agreement" clause of the SFAs, RWJUH submits summary judgment should be granted in its favor because leased nurses are not employees of RWJUH and are therefore not covered by the CBAs. (Def.'s Mem. at 16 (emphasis added).) The CBAs define an "employee" as a person "included within the bargaining unit." (Def. SOF ¶¶ 11, 18, 31.) The bargaining unit consists of:

> all full-time and regular part-time registered nurses and graduate nurses employed by Robert Wood Johnson Hospital at its New Brunswick location, including those registered nurses and graduate nurses employed as registered nurse first assistants, staff nurses, in-service education instructors, infection control nurses, utilization review nurses, community health nurses, urology clinical coordinator, home trainer coordinators (dialysis), home trainers renal dialysis, field service worker/discharge planning nurses, Sr. discharge planners, discharge planning nurses, assistant head nurses-operating room, scoliosis program coordinators, program coordinators, Pediatric Chronic Disease Program, Cardiac Catherization nurses, cardiac rehabilitative nurses, specials procedures nurses, vascular laboratory nurses, lithotripter nurse, oncology nurses and directors, directors of home care, administrative supervisors, head nurses, assistant head nurses (except operating room), all other professional employees other than registered nurses, technical employees, guards and supervisors within the meaning of the Act and all other employees.

(2003–2006 CBA at Art. 1.1; 2006–2009 CBA (same); 2009–2012 CBA (same).) RWJUH concludes that based on this language, it is "only obligated to contribute on behalf of nurses who are full-time or regular part-time employees," subject to the enumerated exceptions. (Def.'s Mem. at 16.) RWJUH further argues that the SFAs and Trust Agreement "mirror this construction." (*Id.*) For example, the Trust Agreement defines "employees" as "any person covered by a Collective Bargaining Agreement and a Participation Agreement" who is "engaged

in employment with respect to which the Employer is obligated to make Contributions to the Trust." (Trust Agreement (Dkt. No. 48–3) at Art. I § 6.)

Plaintiff also points to Section I, but relies on the SFA language stating "the Employer shall contribute on *all individuals performing work covered* by the collective bargaining agreement." (*See* Pl.'s Resp. at 18 (emphasis in original).) Plaintiff argues "the SFA obligation has always been defined in terms of the work covered by the collective bargaining agreement, and the obligation to contribute exists irrespective of how the employer categorizes those individuals who perform the work." (*Id.* at 22.) In other words, Plaintiff argues that regardless of employment status, RWJUH must contribute on behalf of "employees performing bargaining-unit work in addition to the work performed by its bargaining-unit nurses." (*Id.* at 17–18.) Thus, Plaintiff contends that RWJUH was obligated to make contributions for all leased nurses who "were performing work covered by the CBAs." (*Id.* at 18; Pl.'s Mem. at 21–25.) To that end, Plaintiff has submitted evidence showing that leased nurses performed the same type of nursing services as regular bargaining unit employees, including holding similar responsibilities and working under the same supervisors as regular bargaining-unit nurses employed by RWJUH. (Pl.'s SOF ¶¶ 100–01.)

Plaintiff's interpretation is unreasonable in light of the plain language of the agreements, and it is contrary to the purposes of ERISA Section 515. Plaintiff's reading would render as surplusage the first paragraph of the SFAs, which state that RWJUH is only required to contribute to the Fund on behalf of "employees" who are "subject to the collective-bargaining agreement." *See, e.g.*, *Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 319 (6th Cir. 1984) ("A contract will not be construed so as to reject any words as surplusage if they reasonably can be given meaning." (quoting *Union Inv. Co. v. Fidelity &*

*Deposit Co. of Md.*, 549 F.2d 1107, 1110 (6th Cir. 1977)). The "bargaining unit" is defined in the CBAs and consists generally of "all full-time and regular part-time registered nurses and graduate nurses," except those working in certain specified job titles not relevant here. Thus, the CBAs and the SFAs rely on a nurse's employment status to determine coverage and contribution obligations, and only work performed by "full-time" or "regular part-time" employees is covered.

As with per diem nurses, discussed above, to the extent a nurse is misclassified and should in fact be included in the bargaining unit, there may be a question of fact regarding RWJUH's duty to contribute. However, Plaintiff has raised no such argument with respect to leased nurses, who they concede are not on RWJUH's payroll and are neither "full-time" nor "regular part-time" employees. To the extent Plaintiff has argued that RWJUH may skirt their obligations to the union and the Fund by hiring an excess of leased nurses from staffing agencies, Plaintiff may resolve that issue by bargaining for a better deal rather than now attempting to read new meaning into the unambiguous terms of the relevant agreements. Plaintiff's position with respect to leased nurses is also belied by its acknowledgement elsewhere that the plain language of the SFAs and the CBAs does not cover work unless it is performed by a full-time or regular part-time registered nurse or graduate nurse. (*See, e.g.*, Pl.'s Mem. at 17–18 (arguing RWJUH's contribution obligations depend on whether the nurse's job classification qualifies under the definition in Article 1.1 of the CBA); Pl.'s Resp. at 23–25 (conceding that RWJUH is not required to contribute on behalf of per diem nurses who have no regular schedule even though they are performing the same type of work as full-time and regular part-time employees who are part of the bargaining unit).)

Furthermore, Plaintiff's reading of the contract is contrary to the statute's purpose. Congress passed Section 515 to address the concern that "simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses *unrelated* to the employer's promise and the plans' entitlement to the contributions." *G & W Constr.*, 783 F.3d 1045, 1051–52 (6th Cir. 2015) (alterations and emphasis in original) (quoting *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 87, 102 S. Ct. 851, 861 (1982)). ERISA therefore "dictates a resolution that provides for the simplification of collection procedures for the trustees of . . . benefit funds in order to protect the funds from unnecessary collection costs." *Bunn Enters., Inc. v. Ohio Op. Eng'rs Fringe Ben. Programs*, 606 F. App'x 798, 803 (6th Cir. 2015) (quoting *Noe v. R.D. Jones, Excavating, Inc.*, 787 F. Supp. 759, 765 (S.D. Ohio 1992)). Plaintiff's interpretation serves to complicate its own determination as to the contributions owed by employers participating in the Fund, and it is contrary to the SFA language specifying employers must contribute for "[a]ll hours worked" by employees subject to the bargaining agreement—to interpret the language otherwise would require an hour-by-hour accounting of employees' work to determine whether they were performing duties covered under the CBA. (*See* 2003–2006 SFA at Section I; 2006–2009 SFA (same).) *See also Bunn Enters.*, 606 F. App'x at 803 (holding a CBA required employers to contribute to a pension benefit fund for "all hours worked by their employees, regardless of whether those hours are 'covered' under the contract," which is consistent with the purposes of ERISA, as it provides for the simplification of the audit process and eliminates the potential for employers to manipulate contributions); *McClesky v. DLF Constr., Inc.*, 689 F.3d 677, 679 (7th Cir. 2012) (holding a CBA required contributions for each hour worked by covered cement masons, regardless of the type of work completed, where the CBA covered employees "doing

bargaining unit work" and required the employer to contribute to the fund "for each hour worked by employees covered by the CBAs"); *Iron Workers St. Louis Dist. Council Annuity Trust v. United Ironworkers, Inc.*, No. 15 C 00713, 2016 WL 4701588, at *8 (E.D. Mo. Sept. 8, 2016) (finding the CBA language required contributions on behalf of covered employees for all hours worked, regardless of the type of work performed).

In the alternative, however, Plaintiff contends that leased nurses engaged by RWJUH should be considered "full-time" or "regular part-time" employees, because RWJUH qualified as their employer under the joint employment doctrine. (Pl.'s Resp. at 5.) An employer who does not directly employ a plaintiff may nevertheless be considered a joint employer where it "has control over another company's employees sufficient to show that the two companies are acting as a 'joint employer' of those employees." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997) (citing *Carrier Corp. v. NLRB,* 768 F.2d 778 (6th Cir. 1985)). In determining whether a defendant can be considered a joint employer "for purposes of liability under ERISA and a collective bargaining agreement, the [C]ourt must consider the following four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *S. Elec. Health Fund v. Kelley*, 308 F. Supp. 2d 847, 867 (M.D. Tenn. 2003) (alteration in original) (quoting *Mich. State Painters Ins. Fund v. Ron Simmons Painting, Inc.*, 875 F. Supp. 417, 421 (E.D. Mich. 1995)), *aff'd sub nom. S. Elec. Health Fund v. Heritage Mut. Ins. Co.*, 147 F. App'x 497 (6th Cir. 2005). "The resolution of this question is essentially a factual issue." *Id.*

Plaintiff submitted evidence showing that although leased nurses were not paid directly by RWJUH, it nevertheless exerted significant control over leased nurses. (Pl.'s Resp. at 22.) Plaintiff asserts RWJUH determined the essential terms of leased nurses' employment, relying

on evidence showing leased nurses could have the same responsibilities as RWJUH employees, they were supervised by the same nursing supervisors, they attended RWJUH orientation, and they could be terminated by RWJUH if the hospital was dissatisfied with their performance. (Pl.'s SOAF ¶¶ 74–77.)  Plaintiff also argues RWJUH retained the right to require leased nurses to use its timesheets and to subject them to its policies, rules, and procedures.  (*Id.* ¶ 76.)  This evidence, which RWJUH does not contradict, is sufficient to raise an issue of fact as to whether leased nurses should be considered bargaining-unit employees under a joint employer theory.

### B.  Temporary Employees

Plaintiff makes a second argument based on the text of the SFAs:  Plaintiff asserts that leased nurses are equivalent to "temporary employees," which the SFAs expressly include in RWJUH's contribution obligation.  (Pl.'s Mem. at 22–23.)  At a minimum, Plaintiff argues there is a question of fact on this issue.  (Pl.'s Resp. at 21.)  The SFAs specify that RWJUH must contribute on behalf of "all individuals performing work covered by the collective bargaining agreement, *including probationary, temporary, and part-time employees*."  (2003–2006 SFA at Section I (emphasis added); 2006–2009 SFA (same).)  Plaintiff argues the ordinary meaning of "temporary employees" can reasonably be read to include leased employees, "who RWJUH hired through staffing or 'temp' agencies and are ordinarily understood to be non-permanent employees."  (Pl.'s Resp. at 20.)  Among other things, Plaintiff also argues the 2003–2006 and 2006–2009 CBAs do not explicitly permit RWJUH to hire leased nurses, but do expressly permit the hospital to hire temporary employees—Plaintiff concludes that because RWJUH employed leased nurses during this time period, the only reasonable reading of the CBA language is that "leased" and "temporary" employees were used interchangeably.  (*See* Pl.'s Mem. at 23.)  Plaintiff also relies on extrinsic evidence, including the parties' prior settlement agreement, in

which the term "Temporary Workers" was defined to mean "individuals performing work for [RWJUH] but employed by a temporary staffing or leasing agency." (Dkt. No. 48–19) at 2–3.)

The parties amended the CBA in 2009 to distinguish between "leased" (or "contracted") and "temporary" employees. Specifically, under Art. 1.4(a) of the 2009–2012 CBA, "temporary" employees are defined as "any employee hired on payroll for a predetermined amount of time typically for a specific purpose or project," as contrasted with Art. 1.4(b), which defines a "contracted" employee as "an individual who is employed by another employee who provides services within the hospital." (*Compare* 2009–2012 CBA at 1.4(a)–(b), *with* 2003–2006 CBA at Art. 1.4 (defining "temporary" employee, but not "contracted" employee), *and* 2006–2009 CBA (same).) Also in 2009, Plaintiff proposed amending the SFAs to explicitly include leased nurses, but RWJUH claims it refused to agree to the language.[2] (*Id.*)

---

[2] Plaintiff contends that in 2009, the SFA was amended to include "contracted employees" among the group of individuals for whom contributions were due. (Pl.'s SOF ¶ 40.) RWJUH claims that while RWJUH and the union executed the 2009–2012 CBA, no new SFA was executed in 2009. (Def.'s SOF ¶¶ 20–22, 27.) RWJUH contends that it rejected the 2009–2012 SFA because it added "leased" or "contracted" nurses. (*Id.* ¶¶ 23–24.) RWJUH's Chief Human Resources Officer Martin Everhart testified that he "was repeatedly asked to sign a standard form of agreement, of which I did not" because "leased" or "contracted" nurses are not employed by RWJUH and the terms and conditions of employment are set by the staffing agency for which they work. (*Id.* ¶ 22–24; Everhart Dep. (Dkt. No. 48–11) at 59, 87–89.) According to RWJUH, leased nurses were not included in the previous SFAs, and it refused to sign a SFA for 2009 for this reason. (Def.'s SOF ¶ 26; Def.'s Mem. at 7.) RWJUH argues the 2006–2009 SFA remained in effect for the duration of the 2009–2012 CBA. (*Id.* ¶¶ 27–28.) In contrast, Plaintiffs contends "the SFA was amended in 2009 to include 'leased employees' specifically among the group of individuals for whom contributions were due." (Pl.'s Mem. at 21.) Plaintiff asserts that although RWJUH did not separately sign the SFA, the 2009–2012 CBA provided that RWJUH would make contributions "consistent with the terms of the [SFA] effective July 1, 2009." (*Id.*) Plaintiff further argues RWJUH did contribute to the Fund consistent with the terms of the 2009 SFA and was bound by it whether it signed it or not. (*Id.*) In any case, Plaintiff argues that the parties have treated leased nurses as a type of "temporary employee" for whom contributions are expressly required, and therefore, while they added the "leased employee" language to the 2009 SFA, it was only to provide clarity and not to change the contribution obligation. (*Id.* at 22.)

RWJUH argues the Fund's suggestion to add language mandating that RWJUH contribute on behalf of leased nurses for the first time in 2009 "evidences the Pension Fund's understanding that no obligation previously existed." (*Id.* at 17.)

Even if leased nurses did not qualify as "full-time" or "regular part-time" employees and were therefore not part of the bargaining unit under any of the relevant SFAs or CBAs, there also remain genuine issues of material fact as to whether they qualified as "temporary" employees and were therefore included in the bargaining unit under the agreements. The plain meaning of "temporary" employee is ambiguous and is subject to more than one reasonable interpretation. *Moore*, 690 F.3d at 451. Moreover, the parties have raised reasonable, conflicting interpretations and have submitted extrinsic evidence supporting their respective positions. We accordingly cannot conclusively resolve the issue on summary judgment. *Id.* For the foregoing reasons, both parties' motions for summary judgment as to RWJUH's contribution obligations for leased nurses are denied.

## IV.    ADDITIONAL DISPUTED JOB CLASSIFICATIONS

### A.  Nursing Education Specialists/Associates, Clinical Nursing Specialists, Clinical Educators of Operations, and Diabetes Nurse Clinicians

Finally, the parties have filed cross motions for summary judgment with respect to Plaintiff's claim that RWJUH was delinquent in its contributions for several job classifications for the period from October 2003 to December 2011, including (1) $98,282.70 for Nursing Education Specialists/Nursing Education Associates (job code PP340), (2) $237,628.32 for Clinical Nursing Specialists (job code PP353), (3) $91,559.56 for Clinical Educators of Operations (job code PP430), and (4) $20,007.79 for Diabetes Nurse Clinicians (job code PP516). (Pl.'s SOF ¶ 104.) It is undisputed that each of these positions required an RN license as a specified qualification for the job and the positions were not supervisory. (*Id.* ¶¶ 56–73.)

RWJUH maintains it does not owe contributions on behalf of any of the above job classifications because they are not identified in Section 1.1 of the CBAs as being part of the bargaining unit, the positions do not involve direct patient care as required for inclusion in the bargaining unit, and the positions have never been treated by RWJUH and the Union as bargaining unit employees.  (Def.'s Mem. at 18–20; Def.'s Resp. to Pl.'s SOF ¶ 104.)

First, according to RWJUH, the CBA includes an enumerated list of job classifications included in the bargaining unit, and none of the job classifications for which Plaintiff is seeking contributions are included in that list.  (Def.'s Mem. at 18.)  RWJUH submits that had the Fund intended to include these job classifications, it could have included them in the list in the 2006–2009 and subsequent CBAs, but the language remained the same.  (*Id.*)  As set forth above, Article 1.1 defines the bargaining unit as "all full-time and regular part-time registered nurses and graduate nurses employed by Robert Wood Johnson University Hospital at its New Brunswick location."  (*See* 2003–2006 CBA at Art. 1.1; 2006–2009 CBA (same); 2009–2012 CBA (same).)  Introduced by the word "including," it also lists a number of specific nursing positions that are part of the bargaining unit.  (*Id.*)  Further, it lists certain nursing positions that are excluded from the bargaining unit.  (*Id.* (excluding "all clinical supervisors, assistant directors, directors of home care, administrative supervisors, head nurses, assistant head nurses (except operating room)").)  Finally, it excludes non-nursing employees, defined as "all other professional employees other than registered nurses, technical employees, service and maintenance employees, clerical employees, guards and supervisors within the meaning of the Act and all other employees."  (*Id.*)

We agree with Plaintiff that Article 1.1 sets out "a broad group of employees who are covered by the CBA (all full-time and regular part-time RNs and GNs), illustrating a

non-exhaustive list of functional nurse positions within that broad group, and then excluding a specifically identified subset of full-time and regular part-time RNs and GNs from the bargaining unit." (Pl.'s Mem. at 14.) Contrary to RWJUH's urging, the fact that the disputed job classifications are not expressly listed in Article 1.1 is not dispositive, and holding otherwise would render superfluous the phrase "including those registered nurses and graduate nurses employed as . . . ." *See* Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012) ("The verb *to include* introduces examples, not an exhaustive list") (emphasis in original) (collecting cases)).

Moreover, as Plaintiff argues, RWJUH's reading of the CBA conflicts with other CBA provisions, which discuss benefits for nursing positions not enumerated in Article 1.1. (*See* Pl.'s Resp. at 11–12.) For instance, the CBAs provide wage rates for "Nurse Practitioners/Clinician," indicating they are part of the bargaining unit, yet the position is not specifically listed in Article 1.1. This supports the conclusion that all full-time and regular part-time registered nurses and graduate nurses are included in the bargaining unit unless specifically excluded in Article 1.1. It is undisputed that employees working as Nursing Education Specialists/Nursing Education Associates, Clinical Nursing Specialists, Clinical Educators of Operations, and Diabetes Nurse Clinician require an RN license, and these employees are accordingly "full-time [or] regular part-time registered nurse[s]" employed by RWJUH that do not fall into any of the specifically excluded categories (*i.e.* they are not clinical supervisors, assistant directors, directors of home care, administrative supervisors, head nurses, or assistant head nurses). (Pl.'s SOF ¶¶ 57, 61, 62, 66, 70, 73.) Thus, these registered nurses plainly fall within the bargaining unit.

Relying on extrinsic evidence, RWJUH raises two additional arguments regarding contributions for these positions. First, RWJUH argues contributions were not due because RWJUH and the Union never treated the positions as part of the bargaining unit. (*See* Def.'s Resp. at 11–14.) In support, RWJUH points to evidence showing RWJUH's payroll department has not deducted union dues from the paychecks of employees in the above job codes. (*Id.* at 12 (citing Swenarton Cert. (Dkt. No. 53–1) ¶¶ 3–5).) RWJUH argues Plaintiff is "asking the Court to interpret the CBAs in direct contradiction to the manner in which both the Union and RWJUH have interpreted and implemented the CBAs," and the parties did not make any changes or modifications to the CBAs when they were renegotiated in 2006 or 2009. (*Id.*) While RWJUH's evidence may support an inference that RWJUH and the Union did not treat the job classifications at issue as dues-paying union members, the language in the CBAs and the SFAs plainly contradicts this understanding, and we must rely on the unambiguous words of the contract, which control here. *Orrand*, 794 F.3d at 562 ("Because 'multiemployer plans are entitled to rely on the literal terms of written commitments between the plan, the employer, and the union, the actual intent of and understandings between the contracting parties are immaterial.'") (quoting *New Bakery*, 133 F.3d at 959).

Nor is RWJUH's second argument—that the bargaining unit only includes registered nurses providing direct patient care—convincing. RWJUH claims the nursing classifications are not eligible for contributions because the bargaining unit only includes nurses providing direct care to patients. (Def.'s Mem. at 19.) According to RWJUH, the job description for a Registered Nurse, a staff nurse position indisputably within the bargaining unit, "is entirely focused on direct patient care as illustrated in the position's identified responsibilities," while the disputed job titles of Nursing Education Specialists/Nursing Education Associates, Clinical

Nursing Specialists, Clinical Educators of Operations, and Diabetes Nurse Clinician are filled by nurses employed as clinical subject matter experts with no direct patient care responsibilities. (*Id.*)  Specifically, RWJUH contends the descriptions for the job codes at issue consist of "developing, implementing, evaluating, and serving as a clinical resource in the specific area of expertise."  (Def.'s Resp. at 13–14 (citing Sullivan Cert. ¶ 20, Ex. S (Dkt. No. 48–20)).)

RWJUH also relies on the testimony of Anastasia Jacobs, Chief Human Resources Officer and Vice President at RWJUH, to support its position that the bargaining union was only intended to include registered nurses that were actually performing direct patient care on a regular basis.  (Def.'s Resp. at 13.)  Jacobs testified that "employees subject to the collective bargaining unit" are those nurses that "have direct care of patients on a consistent regular basis." (Sullivan Cert. ¶ 7, Ex. F, Jacobs Dep. (Dkt. No. 48–1) at 156–57.)  Jacobs further stated that nurses who were employed as "clinical subject matter expert[s]" were excluded from the bargaining unit.  (*Id.* at 155–56.)  RWJUH also argues that not restricting the bargaining unit to nurses providing direct patient care would create the unintended result that anyone with a nursing license—even a human resources manager or an "IT Tech person"—would be included in the bargaining unit.  (*Id.* at 13.)

Plaintiffs do not dispute that reading the bargaining unit to include "IT Tech" employees or human resources employees "would be anomalous," but Plaintiffs nevertheless insist that the bargaining unit includes "only those full-time and regular part-time RWJUH employees practicing as professional nurses and for whom maintenance of an RN license is a *requirement* for the job."  (Pl.'s Reply Br. (Dkt. No. 62) at 18 (emphasis in original).)  In other words, Plaintiffs argue the plain language of the CBA supports a finding that only individuals that are employed as nurses and required to maintain an RN license are included in the bargaining unit.

(*Id.* (further arguing "if the position does not require an RN license, the employee working in that position is not practicing as a licensed professional nurse, irrespective of whether that person happens to have an RN license").) Plaintiffs also observe that even some of the enumerated positions listed in Article 1.1 of the CBAs may not provide direct patient care. (*See* Pl.'s Resp. at 15 (citing RWJUH Dep. (Dkt. No. 45–2) at 191–193).) Furthermore Plaintiffs observe that RWJUH shifted and reassigned nursing duties, and therefore, whether positions require "direct patient care" has varied throughout the years, but they have all consistently required an RN license to perform the job. (*Id.*)

RWJUH's position is contrary to the unambiguous contract language, and the Fund is entitled to rely on the plain language of the CBAs. *Orrand*, 794 F.3d at 562. Nowhere does Article 1 or the CBA otherwise mention the provision of direct care responsibilities as a prerequisite to inclusion in the bargaining unit. Because there is no genuine dispute of material fact as to whether RWJUH was obligated to contribute on behalf of Nursing Education Specialists/Nursing Education Associates, Clinical Nursing Specialists, Clinical Educators of Operations, and Diabetes Nurse Clinicians, and it is further undisputed that RWJUH did not make contributions for hours worked by these employees during the relevant period, summary judgment is granted as to these delinquencies. RWJUH is liable to the Fund for past-due contributions for hours worked by employees in the job codes PP340, PP353, PP430, and PP516.

### B. Community Health Nurses

Plaintiff also alleges RWJUH underreported certain hours worked by Community Health Nurses, a position expressly included in the list of positions falling within the bargaining unit in Article 1.1 of the CBAs. (Pl.'s Mem. at 11.) Relying on the First Audit Report, Plaintiff contends RWJUH owes the Fund $6,946 for hours worked by Community Health Nurses during the 2003 to 2005 time period. (Pl.'s SOF ¶ 82.) While RWJUH made a retroactive contribution

on January 17, 2005 on behalf of some Community Health Nurses, Plaintiff relies on the First Audit Report in arguing RWJUH still owes $6,946 for hours worked by five additional Community Health Nurses between October 2003 and January 2005. (Pl.'s SOF ¶¶ 81–82; Pl.'s SOAF ¶¶ 70–71; Vivirito Decl. (Dkt. No. 59) ¶ 8.)

RWJUH does not disagree that the position is included in the bargaining unit, but instead argues no contributions are outstanding on behalf of Community Health Nurses, because although RWJUH failed to "properly contribute" on behalf of these nurses "[d]ue to a clerical error" during the 2003 to 2005 time period, it corrected the error and "provided the Pension Fund with the owed contributions." (Def.'s Mem. at 18; *see also* Def.'s Resp. to Pl.'s SOF ¶ 82.) RWJUH relies on a January 11, 2008 email from Geri Ann Swenarton, an RWJUH employee, to the Fund's auditor, Phil Vivirito, stating that RWJUH reviewed the draft audit report and requested a meeting to discuss "areas we are not in agreement with." (Sullivan Cert., Ex. O (Dkt. No.48–16) at PageID#: 1164.) To the extent the email is admissible or relevant, it falls short of establishing RWJUH is not delinquent in its contributions on behalf of the Community Health Nurses at issue, and Plaintiff has offered competent evidence to the contrary. Based on the evidence before us, we cannot conclude whether RWJUH has met its contribution obligations with respect to Community Health Nurses. Accordingly, summary judgment is denied as to Plaintiff's claim for delinquent contributions for Community Health Nurses.

## C. Child Life Coordinators

Finally, RWJUH argues the Child Life Coordinator position does not require a registered nurse license, and is therefore excluded from the bargaining unit. (Def.'s Mem. at 20.) A Child Life Coordinator addresses the psychological needs of children, young adults, and adolescents, and need not be a registered nurse or graduate nurse. (*Id.*) Plaintiff concedes that the position does not require a registered nurse license, and employees in the position are not practicing as

professional nurses; therefore, it agrees the position is excluded from the bargaining unit. (Pl.'s Resp. at 16, n.8.)  Accordingly, summary judgment is granted in RWJUH's favor with respect to any delinquent contributions allegedly owed for Child Life Coordinators.

## CONCLUSION

For the foregoing reasons, we grant Plaintiff's partial motion for summary judgment as to its claims for delinquent contributions for (1) Case Managers (for the period from October 1, 2006 to September 30, 2007); and (2) Nursing Education Specialists/Nursing Education Associates, Clinical Nursing Specialists, Clinical Educators of Operations, and Diabetes Nurse Clinicians.  We grant RWJUH's motion for summary judgment as to Plaintiff's claim for delinquent contributions owed for Child Life Coordinators.  The motions for summary judgment are denied with respect to Plaintiff's claims that RWJUH failed to contribute to the Fund on behalf of (1) per diem nurses, (2) leased nurses, and (3) Community Health Nurses.  In light of the ruling on the parties' motions for summary judgment, the joint motion to modify the scheduling order is denied as moot.  It is so ordered.

_____
Marvin E. Aspen
United States District Judge


Dated: June 12, 2017
       Chicago, Illinois